HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PUGET SOUNDKEEPER ALLIANCE,

        Plaintiff,

    v.

LOUIS DREYFUS COMMODITIES LLC, et al.,

        Defendants.

CASE NO. C14-803RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiff Puget Soundkeeper Alliance's ("PSA") Motion for Partial Summary Judgment.  Dkt. # 41.  Plaintiff requests partial summary judgment against three of the Defendants in this matter: Louis Dreyfus LLC ("LD LLC"), LDC Washington LLC ("LDC Washington"), and LD Commodities Seattle Export Elevator LLC ("Seattle Export Elevator").[1]  *See id.*  For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** PSA's motion.[2, 3]

---

[1] The PSA has named two other entities as defendants: Louis Dreyfus Commodities and Louis Dreyfus Commodities NA LLC.  *See* Dkt. # 19 (Second Am. Compl. ("SAC")) ¶ 1.

[2] The Court strongly disfavors footnoted legal citations, which the PSA seems intent on using.  *See* Dkt. # 41 (including 180 footnotes); Dkt. # 60 (including 82 footnotes); Dkt. # 64 (including 67 footnotes).  Footnoted citations serve as an end-run around the page limits and formatting requirements dictated by the Local Rules.  *See* Local Rules W.D. Wash. LCR 7(e).  Moreover, several courts have observed that "citations are highly relevant in a legal brief" and including them in footnotes "makes brief-reading difficult."  *Wichansky v. Zowine*, No. CV-13-01208-PHX-DGC, 2014 WL 289924, at *1 (D. Ariz. Jan. 24, 2014).  The Court strongly discourages the Parties from footnoting their legal citations in any future submissions.  *See Kano v. Nat'l Consumer Co-op Bank*, 22 F.3d 899, 899-900 (9th Cir. 1994).

ORDER – 1

## II.  BACKGROUND

This Clean Water Act ("CWA") citizen suit contends that one (or all) of the Louis Dreyfus entities has violated the CWA by discharging grain materials directly into Elliott Bay or by violating various conditions in the various industrial stormwater general permits in effect.  *See* SAC ¶ 1.

Briefly, the Louis Dreyfus entities operate a facility located at Pier 86, 955 Alaskan Way W, Seattle, WA 98119.  *See id.* ¶ 10.  They have obtained coverage for the facility under the relevant general permits issued by the Washington Department of Ecology – specifically, they have coverage under Permit No. WAR002719.  *Id.* ¶ 15.

The PSA alleges a veritable cavalcade of violations of the CWA stemming from the beginning of the statutory period through the present.  These violations include, *inter alia*, discharges of grain or grain dust directly into the waters of Elliott Bay, failing to implement best management practices as required by the general permit, failing to develop a stormwater pollution prevention plan ("SWPPP") in compliance with the general permits, and failing to properly sample and submit discharge monitoring reports as required by the general permits.  *See id.* ¶¶ 14, 20-23, 28-29.

## III.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

---

[3] The Court also strongly recommends that the PSA cite to valid, relevant, and binding authority. For example, the PSA often relies on *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109 (4th Cir. 1988).  But that case is not binding on this Court and its viability is in question.  *See Dubois v. U.S. Dep't of Agriculture*, 20 F. Supp. 2d 263, 268 n.4 (D.N.H. 1998) (noting that the Fourth Circuit expressly overturned *Simkins Indus.* in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 149 F.3d 303, 304 n.4 (4th Cir. 1998)).

ORDER – 2

the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

## IV. ANALYSIS

a. Whether the PSA has Standing

Although not seriously disputed, it is readily apparent that the PSA has sufficient standing to bring this action because its members have suffered injury in fact fairly traceable to Louis Dreyfus' violations and which are redressable by the relief sought.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

"The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a

ORDER – 3

particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Pac. Lumber Co.*, 230 F.3d at 1147 (citing cases). Several of the PSA's members have shown that they have suffered (or will suffer) such injury in fact. *See* Dkt. # 45 (Wilke Decl.) ¶¶ 12-19; Dkt. # 46 (Eaton Decl.) ¶¶ 8-10; Dkt. # 47 (Frederickson Decl.) ¶¶ 8-18; Dkt. # 48 (Gannon Decl.) ¶¶ 6-11. The interests at stake here – namely environmental protection – are germane to the PSA's purpose. *See* Dkt. # 45 (Wilke Decl.) ¶ 3. And it appears that neither the claims themselves nor the relief sought require the individual members of the PSA to participate.

      b.  <u>Whether Summary Judgment is Appropriate for Alleged Discharges of Grain</u>

      The PSA first seeks summary judgment on the liability of the three Louis Dreyfus entities here for violations of the CWA. *See* Dkt. # 41 at 11. PSA claims that these three entities have persistently violated the CWA by discharging grain or grain dust into Elliott Bay between March 30, 2009 and the present. *See id.*

      The PSA apportions liability into four time frames:

| Time Period | Liable Parties |
|---|---|
| March 30, 2009 – December 20, 2010 | LD LLC (as permit holder and operator) |
| December 20, 2010 – October 14, 2014 | LD LLC (as permit holder) and Seattle Export Elevator (as operator) |
| October 14, 2014 – November 1, 2014 | Seattle Export Elevator (as permit holder and operator) |
| November 1, 2014 – present | LDC Washington (as permit holder and operator) |

*See id*.

      Defendants raise certain issues regarding LD LLC's transfer of the permit to Seattle Export Elevator. *See* Dkt. # 54 at 8-10. Specifically, the Louis Dreyfus entities contend that LD LLC transferred the permit to Seattle Export Elevator on December 20, 2010 and that such transfer was recognized by the Department of Ecology. *See id.*

ORDER – 4

Despite the PSA's arguments otherwise, Louis Dreyfus has shown that a transfer of coverage may have been submitted to the Department of Ecology before October 2014 and may have been effective as of December 20, 2010.

For one, the Department of Ecology interacted with Seattle Export Elevator as though it were the permittee several times prior to October 2014. *See* Dkt. # 17-1 (Zemel Decl.) Ex. 10 at 9 (May 24, 2013 letter addressed to "Louis Dreyfus Seattle Export Elevator LLC" regarding "Permit No. WAR-002719"); Dkt. # 36 (Zemel Decl.) Ex. 2 at 2 (addressed to "Louis Dreyfus Corp Grain Elevator"), Ex. 10 at 3 (addressed to "Louis Dreyfus Commodities"); Dkt. # 56-5 (Chapin Decl.) Ex. 5 at 2 (invoice from Department of Ecology to "LD Commodities Seattle Export Elevator").

More importantly, WAC 173-220-200 (the Department of Ecology's rule on the transfer of NPDES permits) provides that a transfer is effective as of the date specified in an agreement so long as the Department does not object – even, apparently, if the transfer took place years before. Specifically, that regulation provides that "[a] permit is automatically transferred to a new discharger if: (a) A written agreement between the old and new discharger containing a specific date for transfer of permit responsibility, coverage, and liability is submitted to the director; and (b) The director does not notify the old and new discharger of his/her intent to modify, or revoke and reissue the permit." *Id.* Furthermore, "[i]f this notice is not given, the transfer *is effective on the date specified in the agreement mentioned in (a) of this subsection.*" *Id.* (emphasis added). Louis Dreyfus LLC and Seattle Export Elevator filed a transfer of coverage on October 14, 2014, specifying December 20, 2010 as the date the permit was transferred. *See* Dkt. # 56-6 (Chapin Decl.) Ex. 6. To date, the Department of Ecology has not notified the Louis Dreyfus entities that it intended to modify or to revoke and reissue the permit. *See id.* ¶ 14. This also indicates that the transfer was effective on December 20, 2010. *See also* Dkt. # 52-3 (Zemel Decl.) Ex. 3 at 13 (modified stormwater general permit dated May 16, 2012 condition providing that a transfer of a permit is "effective on the date

ORDER – 5

1    specified in the written agreement unless *Ecology* gives" notice of intent to revoke

2    coverage under the general permit).

3         Even beyond issues as to the effective date, it is not entirely settled that Louis

4    Dreyfus LLC and Seattle Export Elevator could be held jointly liable for discharges that

5    occurred in this span of time.  Although the court in *Puget Soundkeeper Alliance v.*

6    *Cruise Terminals of Am., LLC* recognized that parties could be jointly liable for

7    discharges, this was only if they had knowledge of and the ability to control the

8    activities.[4]  No. C14-0476 JCC, 2015 WL 7431415, at *19 (W.D. Wash. Nov. 20, 2015).

9    The Louis Dreyfus entities have presented some evidence that Louis Dreyfus LLC had no

10   operational control over the grain terminal after December 20, 2010.  *See* Dkt. # 56

11   (Chapin Decl.) ¶ 16.  PSA has countered with evidence that there was little change in the

12   day to day operations, suggesting that perhaps the same entities had knowledge of and

13   control over the discharges.  *See* Dkt. # 41 Ex. A [Meehl Depo. Tr.] at 10:9-11:6, 91:24-

14   92:4; Ex. B [McNab Depo. Tr.] at 126:13-22; Ex. D [Chapin Depo. Tr.] at 10:2-16, 13:1-

15   7, 14:23-16:16.

16        Given this, summary judgment is not appropriate because a genuine dispute exists

17   as to who the permit holder and operator was between December 20, 2010 and October

18   14, 2014.  Moreover, a genuine issue exists as to whether these entities had knowledge of

19   and control over the discharges at issue.

20        This issue also informs whether Louis Dreyfus LLC can be held liable for "wholly

21   past" violations.  *See* Dkt. # 54 at 11.  To be sure, "citizen plaintiffs may not sue for

22   'wholly past' violations of the Clean Water Act but must instead allege 'continuous or

23

24   ───────────────
     [4] This is somewhat in contrast to the PSA's contention that permittees are liable simply by virtue
     of holding a permit.  The CWA bans "*the discharge* of any pollutant by any person."  *See* 33

25   U.S.C. § 1311(a).  Conceivably, if Louis Dreyfus LLC retained the permit, but did not exercise
     control over or have knowledge of any discharges or activities by the operator of the facility, it

26   may not necessarily be liable – it would not, after all, have discharged any pollutants in violation
     of its NPDES permit.  *See Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194,
     1204 (9th Cir. 2013) (noting that permittees are liable under the CWA when they discharge

27   pollutants in excess of levels specified in the permit).  Of course, in that scenario, the actual
     operator would have operated without a permit, possibly subjecting them to liability.

28   ORDER – 6

intermittent' violations." *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 920 (9th Cir. 2004) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.* 484 U.S. 49, 57-64 (1987)).  But the Ninth Circuit has also held that "[l]iability for civil penalties attaches at the time of the violation."  *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir. 2002) (citing *Ecological Rights Found. v. Pac. Lumber Co.*, 203 F.3d 1141, 1153 (9th Cir. 2000)).  This action was filed in May 2014, prior to the purported October 2014 permit transfer.  *See* Dkt. # 1.  Conceivably, Louis Dreyfus LLC could be held liable if it was still the permittee and was still exercising control over the facility because liability would have attached at that time.  *Cf. San Francisco Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 771 (N.D. Cal. 2011) ("dischargers are not insulated from liability merely because they make illegal discharges via a system owned and operated by other entities").  In this sense, assuming that Louis Dreyfus LLC was the operator in May 2014, there is little difference between the transfer of ownership in *Tosco* and the transfer here.  *See Tosco*, 309 F.3d at 1160.

Next, the PSA requests summary judgment as to several distinct discharges of grain or grain dust – discharges they contend establish the relevant Louis Dreyfus entities' liability as a matter of law.  Dkt. # 41 at 15-18.  "The Ninth Circuit has stated that a defendant must obtain an NPDES permit when it '(1) discharge[s] (2) a pollutant (3) to navigable waters (4) from a point source.'"  *Hawai'I Wildlife Fund v. Cty. of Maui*, 24 F. Supp. 3d 980, 988-89 (D. Haw. 2014) (quoting *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir. 2001)); *see also Puget Soundkeeper Alliance v. Whitley Mfg. Co., Inc.*, Case No. C13-1690RSL, 2015 WL 6870716, at *1 (W.D. Wash. Nov. 9, 2015).

There does not appear to be any dispute that grain or grain dust may qualify as a "pollutant" under the CWA.[5]  There is also little dispute that the waters of Elliott Bay are

[5] The CWA broadly defines "pollutant" to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  *See* 33 U.S.C. § 1362(6); *see also Benjamin v.*

ORDER – 7

"navigable waters" under the CWA.  *See* 33 U.S.C. § 1362(7).  Finally, with respect to the alleged grain or grain dust discharges, the Louis Dreyfus entities do not dispute that any grain or grain dust swept or dropped into Elliott Bay by broom, shovel, or grain loading spout, or discharged into Elliott Bay through the stormwater drainage system comes from a "point source."[6]  *See* Dkt. # 54 at 17 & n.12.  Finally, there is apparently no dispute that General Permit No. WAR002719 does not authorize grain discharges.  *See* Dkt. # 52-4 (Zemel Decl.) Ex. 4 at 9 ("Beginning on the effective date of this permit and lasting through its expiration date, the Permittee is authorized to *discharge stormwater* and conditionally approved non-stormwater *discharges* to *waters of the state*"), 33-34 (listing conditionally authorized non-stormwater discharges).  With that, the PSA seeks a determination that the relevant Louis Dreyfus entities are liable for violating the CWA for nine distinct time periods.  *See* Dkt. # 41 at 15-16.

First, the PSA contends that the Louis Dreyfus entities are liable every day Pier 86 loaded grain to vessels during the statutory period until May 9, 2014.  *See id.* at 15.  The PSA contends that it was the facility's official policy to wash grain or grain dust into Elliott Bay and, more importantly, that this was a daily or regular occurrence.

However, a genuine issue of material fact exists as to whether an official policy for washing grain or grain dust into Elliot Bay was in place prior to May 9, 2014, whether grain spills accompanied every ship loading, and whether those grain spills (or portions thereof) were always discharged into Elliot Bay.  The only support the PSA provides for the existence of an "official policy" is a line from a table in the facility's SWPPP

---

*Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1215 (D. Or. 2009).  Moreover, grain or grain dust has likely already been determined to be a pollutant because facility was operating under an NPDES permit.  *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 566 (5th Cir. 1996) ("Typically, citizen suits are brought against persons who are violating effluent limitations or permits issued by EPA. In such cases, the question of whether the discharged substance is a pollutant is not in issue because EPA will have already made that determination through the effluent limitation or permit.").

[6] A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

ORDER – 8

identifying the fact that "[r]esidual grain dust is washed into bay after grain spill is cleaned up on dock" in assessing the likelihood of a potential pollutant is included in stormwater discharge. *See* Dkt. # 52-14 (Zemel Decl.) Ex. 14 at 36. But that same document indicates that this was merely a *potential* pollutant source and the best management practices are meant to prevent grain from ever reaching the water. *See id.* at 16-18, 36. Moreover, the supervisor of the site disavows such a policy. *See* Dkt. # 57 (McNab Decl.) ¶¶ 17. There is evidence that the facility took efforts to instruct and train workers to stop washing grain off the dock. *See id.* ¶ 19, Ex. 8; Dkt. # 41-1 [Meehl Depo. Tr.] at 29:2-25. And there is evidence that grain did not always spill the water when ships were loaded at the facility. *See* Dkt. # 41-3 [Meader Depo. Tr.] at 10:22-24, 30:7-10 (testimony of grain inspector for the Department of Agriculture whose job was to check for grain spills).[7] This evidence is sufficient to raise a genuine issue as to the facility's practices prior to May 9, 2014.[8]

The PSA also contends that the Court should find the relevant Louis Dreyfus entity liable for discharges occurring on April 23, 2014,[9] June 8, 2014, October 7, 2015, October 19, 2015, November 30, 2015, December 24, 2015, February 2, 2016, February 4-6, 2016, and February 12, 2016. *See* Dkt. # 41 at 15-16. Beyond evidentiary

---

[7] The PSA rightly notes that the deposition excerpts that the Louis Dreyfus entities submitted lack the reporter's certifications and are therefore unauthenticated. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002). Of course, because the PSA properly authenticated the same transcripts from the same deponents, their motion to strike is misplaced. *See id.* at 775-76 ("We now hold that when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity.").

[8] To be sure, the evidence strongly suggests that it was common for grain or grain dust to fall onto the loading dock. *See* Dkt. # 41-1 [Meehl Depo. Tr.] at 19:17-20:14 (indicating that it was not necessarily common for grain to fall into Elliott Bay, but that minute amounts of grain likely fall onto the shipping pier on a daily basis); Dkt. # 41-2 [McNab Depo. Tr.] at 110:7-17 (indicating that the grain fell on the dock on a regular basis). Moreover, there is evidence that workers on the dock regularly swept grain or grain dust into the water, sometimes even at the direction of management. *See* Dkt. # 57 (McNab Decl.) ¶ 18.

[9] For some reason, this incident was included in the "post-May 10, 2014" period.

ORDER – 9

objections[10] that the Court has overruled, the Louis Dreyfus entities do not seriously dispute any of the alleged violations. *See* Dkt. # 54 at 13-14. The one exception is the spill alleged to have occurred on February 4-6, 2016. *Id.* at 14.

Given these apparent concessions, the Court finds that summary judgment is appropriate for the incidents occurring on April 23, 2014, June 8, 2014, October 7, 2015, October 19, 2015, November 30, 2015, December 24, 2015, February 2, 2016, and February 12, 2016. There is no genuine issue that grain or grain dust was discharged into the water at these times. *See* Dkt. # 49 (Joerger Decl.) Exs. 1-2 (April 23, 2014); Dkt. # 50 (M. Tupper Decl.) Exs. 1-2 (June 8, 2014); Dkt. # 42 (Kinn Decl.) Ex. 1 (November 30, 2015), Ex. 8 (October 7, 2015), Ex. 9 (October 19, 2015), Ex. 10 (December 24, 2015); Dkt. # 52 (Zemel Decl.) Ex. 12 (February 2, 2016), Ex. 13 (February 12, 2016).

The Court also finds that summary judgment is appropriate for the discharge allegedly occurring on February 4-6, 2016. The PSA submits photographs that show a large amount of grain was spilled on the edge of the pier and sat there for over two days. *See* Dkt. # 42 (Kinn Decl.) Ex. 5. It would be rather farfetched to find that none of this grain spilled into Elliott Bay.

The question of precisely which Louis Dreyfus entity is liable for the April 23, 2014 and June 8, 2014 discharges remains open given the factual disputes surrounding the permit transfer. There is no dispute, however, that LDC Washington was both the permit holder and operator of the facility for the October 7, 2015, October 19, 2015, November 30, 2015, December 24, 2015, February 2, 2016, and February 12, 2016

---

[10] The Louis Dreyfus entities object to much of the evidence supporting these incidents – namely statements and photographs attached to the declaration of Katelyn Kinn – as not based on personal knowledge. *See* Dkt. # 54 at 6-7. Those objections are **overruled**. Ms. Kinn indicates that she visited the facility multiple times and reviewed video footage recorded by cameras stationed around the facility. *See* Dkt. # 42 (Kinn Decl.) ¶¶ 3-4. She plainly has personal knowledge of a video that she reviewed. *See* Fed. R. Evid. 602. And she clearly can authenticate that the video and photographs depict what they purport to depict – she has visited the facility and been told by the Louis Dreyfus entities' representatives that the "video system documents the date and time when the recordings were made." *Id.* ¶ 4; Fed. R. Evid. 901; *People of Territory of Guam v. Ojeda*, 758 F.2d 403, 408 (9th Cir. 1985) ("Under the Federal Rules, the witness identifying the item in a photograph need only establish that the photograph is an accurate portrayal of the item in question").

ORDER – 10

1   discharges.  *See* Dkt. # 52-8 (Zemel Decl.) Ex. 9 (transfer of Permit No. WAR002719

2   from Seattle Export Elevator to LDC Washington effective November 1, 2014).

3           c.   Whether Summary Judgment is Appropriate for Violating the General Permit
                 Monitoring and Reporting Requirements

4           Next, the PSA requests summary judgment against the Louis Dreyfus entities for

5   violating the reporting requirements under its NPDES permit.  *See* Dkt. # 41 at 16.

6   Specifically, the PSA argues that the relevant Louis Dreyfus entities are liable for three

7   reporting failures: (1) failing to monitor Catch Basin #3 ("CB # 3") and the access pier

8   for 21 successive quarters, (2) failing to monitor the shipping pier for the entire statutory

9   period, and (3) failing to submit discharge monitoring reports ("DMR") for each required

10  sample point for each quarter.  *See id.* at 16-20.

11          "[A] permittee violates the CWA when it discharges pollutants in excess of the

12  levels specified in the permit, or where the permittee otherwise violates the permit's

13  terms."  *Cty. of Los Angeles*, 725 F.3d at 1204 (citing *Russian River Watershed Prot.*

14  *Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1138 (9th Cir. 1998); 40 C.F.R. §

15  122.41(a); *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995));

16  *Pac. Lumber Co.*, 230 F.3d at 1151 (citing 33 U.S.C. § 1365(f)(6); 33 U.S.C. § 1318)

17  ("the Clean Water Act allows citizen suits based on violations of any conditions of an

18  NPDES permit, even those which are purely procedural").

19                  i.   *CB #3 and the Access Pier*

20          The PSA first contends that the Court should find that the relevant Louis Dreyfus

21  entities violated the NPDES permit (and the CWA) by failing to collect stormwater

22  samples from two discharge points – CB # 3 and the access pier – between the second

23  quarter of 2009 and the third quarter of 2014.  *See* Dkt. # 41 at 17-18.[11]

24

25  _____

    [11] For reasons unknown to the Court, the PSA requests that the Court enter summary judgment
26  on liability for *another* sampling point – catch basin 1 – in its reply brief, despite failing to seek
    summary judgment for violations related to this sampling point in its motion.  *Compare* Dkt. #
27  60 at 5 *with* Dkt. # 41 at 17-18.  The Court declines to consider this request as it is a new
    argument improperly raised in reply.  *See Karpenski v. Am. Gen. Life Cos., LLC*, 916 F. Supp. 2d
28  1188, 1191 (W.D. Wash. 2012).
    ORDER – 11

1    The general permits in effect during this period[12] required the permittees to

2 conduct quarterly sampling of stormwater.  *See* Dkt. # 52 (Zemel Decl.) Ex. 2 at 26 ("All

3 facilities under this permit . . . are required to conduct quarterly monitoring and sampling

4 of stormwater as identified below"), Ex. 3 at 22 ("The Permittee shall sample the

5 *discharge* from each designated location at least once per quarter").  Under each version

6 of the general permit, permittees were required to sample stormwater at "[e]ach distinct

7 point of discharge offsite."  *See id.* Ex. 2 at 27, Ex. 3 at 23 ("The Permittee shall sample

8 each distinct point of *discharge* off-site except as otherwise exempt from monitoring as a

9 'substantially identical outfall'").

10   The Parties do not appear to dispute that the Louis Dreyfus entities were required[13]

11 to collect stormwater samples from CB # 3[14] and the access pier.[15]  *See* Dkt. # 54 at 14-

12 15.  The PSA contends that storm events sufficient to collect samples occurred in all 21

13 quarters for the access pier and for 18 quarters for CB # 3.  *See id.*  Specifically, the PSA

14 contends that stormwater discharged from CB # 3 and from the access pier every day on

15 which more than 0.25 inches or more than 0.10 inches, respectively, of rain fell.  *See* Dkt.

16 # 43 (Horner Decl.) ¶¶ 33-34.  The Louis Dreyfus entities do not appear to seriously

17 dispute the PSA's contentions that a discharge occurred and no sample was obtained

18 from CB # 3 for 18 quarters.  *See* Dkt. # 54 at 14-15.

19   Louis Dreyfus disputes that 0.10 inches of rainfall is sufficient to generate a

20 discharge from the access pier because of the rough surface of the pier.  *See* Dkt. # 59

---

[12] It is not entirely clear what terms were effective between April 30, 2009 and January 1, 2010. *See* Dkt. # 52 (Zemel Decl.) Ex. 2 at 2 (expired April 30, 2009), Ex. 3 at 2 (effective date January 1, 2010).

[13] Under the 2002 general permit, "[w]here pollutant types [did] not vary," permittees were allowed to "sample only the discharge point with the highest concentration of pollutants." *Id.* Ex. 2 at 27.

[14] The facility's SWPPP identifies CB # 3 as a sampling location and states that CBs #2 and #3 are substantially identical discharge points.  *See* Dkt. # 52-5 (Zemel Decl.) Ex. 5 at 24-25.

[15] Louis Dreyfus has established a monitoring point (MP 4) on the access pier.  *See* Dkt. # 59 (Reese Decl.) ¶ 13.

ORDER – 12

(Reese Decl.) ¶ 23.  That would appear to create a genuine issue of material fact as to whether there was sufficient precipitation to collect a sample for the access pier discharge point – after all, under the 2010 and 2015 general permits, permittees are not required to sample in quarters where there is no discharge.  *See* Dkt. # 52 (Zemel Decl.) Ex. 3 at 23 ("**Permittees need not sample** outside of *regular business hours*, during unsafe conditions, or **during quarters where there is no discharge**, but shall submit a Discharge Monitoring Report each reporting period") (emphasis added), Ex. 4 at 25 (same).  But the Louis Dreyfus entities also present evidence that functionally admits that sufficient stormwater discharges occurred between the first quarter of 2010 and the second quarter of 2014.  *See* Dkt. # 59-5 (Reese Decl.) Ex. 5 n.3.  And the 2002 general permit required a stormwater sample regardless of whether a discharge occurred.  *See* Dkt. # 52-2 (Zemel Decl.) Ex. 2 at 23-24.

Ordinarily, that would be the end of it – and summary judgment would be appropriate for the access pier and CB # 3 sampling violations.  However, Louis Dreyfus challenges the precipitation data underlying the PSA's analysis.  *See* Dkt. # 54 at 15.  Specifically, they present evidence suggesting that precipitation data used by the PSA's expert may not necessarily be representative of conditions at the facility because of distance.  *See* Dkt. # 59 (Reese Decl.) ¶ 24 ("there can be differences in precipitation frequency and magnitude between the facility and the weather station selected by Dr. Horner"); *see also* Dkt. # 41-6 [Alongi Depo. Tr.] at 18:12-24 (opining that although there was not a strict distance from a site that would render precipitation data unreliable, microclimates and topography considerations were paramount).  Despite the PSA's characterization of this challenge as "desperate" (Dkt. # 60 at 6), other courts have denied summary judgment on liability precisely on these grounds (*see Cruise Terminals*, 2015 WL 7431415 at *20 (denying summary judgment on liability because of evidence that precipitation data was unreliable "since '[t]here can be differences in precipitation frequency and magnitude within this distance.'")).

ORDER – 13

That means that summary judgment is inappropriate for any sampling violations after the issuance of the 2010 general permit. The standard is clear that "[i]n deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). The Louis Dreyfus entities have presented sufficient evidence from which to infer that the precipitation data upon which Mr. Horner relies is not representative of the actual conditions at the facility.

But that same reasoning does not apply to any sampling violations under the 2002 general permit. That permit required sampling regardless of whether a discharge occurred. Dkt. # 52-2 (Zemel Decl.) Ex. 2 at 23-24. Given the Louis Dreyfus entities' concession that they did not sample through three quarters of 2009, they are liable for three sampling violations each for CB # 3 and the access pier.

### ii.   *The Shipping Pier*

Next, the PSA seeks summary judgment for the Louis Dreyfus entities' purported failure to monitor the shipping pier for the entire statutory period. *See* Dkt. # 41 at 19. It contends that the shipping pier has never been sampled, is not substantially identical to the access pier, and was not included on the SWPPP. *See id.*

Louis Dreyfus first argues that the shipping pier is not a "point source," meaning that it is not subject to the CWA or the general permits. *See* Dkt. # 54 at 16. They contend that the shipping pier is not a "discernible, confined and discrete conveyance" that qualifies as a point source. *See id.*

Courts have routinely held "that the 'definition of a point source is to be broadly interpreted.'" *Cmty. Ass'n for Restoration of the Envm't v. Henry Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002) (quoting *Dague v. City of Burlington*, 935 F.2d 1343, 1354 (2d Cir. 1991)). The touchstone for determining whether an activity qualifies as a point source "is the ability to identify a discrete facility from which pollutants have escaped."

ORDER – 14

*Wash. Wilderness Coalition v. Hecla Min. Co.*, 870 F. Supp. 983, 988 (E.D. Wash. 1994); *see League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002) (distinguishing between nonpoint and point sources and highlighting the difficulty in tracing nonpoint pollution to discrete sources).  There is little question that any stormwater runoff in this situation could be traced to pollutants on the shipping pier.

Still, as the Louis Dreyfus entities emphasize, Ninth Circuit authority is relatively "clear that some type of collection or channeling is required to classify an activity as a point source."  *Greater Yellowstone Coalition v. Lewis*, 628 F.3d 1143, 1152 (9th Cir. 2010) (citing *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984)) (finding that water that ran off the surface of a mine cover into a stormwater drain system before being released was from a point source but that which made it through the cover was not because there was "no confinement or containment of the water").

As a result, it is not entirely certain that the shipping pier is a point source.  For example, in *Cruise Terminals*, the court found that a cruise terminal itself was not a point source because the plaintiff had not identified the manner in which the cruise terminal – separate from its stormwater drainage system – operated as a confined, discrete conveyance.  2015 WL 7431415 at *7.  This was so even though the cruise terminal supported cranes and other objects that could be point sources.  *See id.* at *13-16.  In this same vein, the Louis Dreyfus entities argue that the shipping pier is merely a "flat, paved surface" where "[r]ain that falls on the shipping pier sheet flows off the sides, underneath the bull rail, without being confined or contained."  *See* Dkt. # 54 at 18.

The Court is not entirely convinced.  Other courts in this district have found (albeit implicitly) that piers (in all likelihood quite similar to the shipping pier here) may qualify as point sources.  *See Puget Soundkeeper Alliance v. Rainier Petroleum Corp.*, Case No. C14-0829JLR, Dkt. # 75 at 23-24 (finding that stormwater discharges from pier were associated with industrial activity).  The implementing regulations define "[s]torm water

ORDER – 15

discharge associated with industrial activity" to mean "the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14).  The term expressly includes "storm water discharges from . . . shipping and receiving areas."  *Id.*  Mirroring this, there is evidence that the Department of Ecology considers the shipping pier to be a point source.  *See* Dkt. # 61-1 (Zemel Decl.) Ex. 20 at 2.  Finally, the undisputed facts strongly suggest that the shipping pier is graded in a manner that conveys stormwater through the bull rail and into Elliott Bay. *See* Dkt. # 59 (Reese Decl.) ¶ 11 ("The asphalt surface of the shipping pier is rough and appears to have no consistent slope, though it may be slightly crowned in the center").

Nevertheless, the Court finds that a genuine issue of material fact exists as to whether the shipping pier is a point source.  Making all inferences in the Louis Dreyfus entities' favor, a reasonable juror could find that the shipping pier does not collect, confine, or convey storm water and is therefore not a point source.

That does not end the inquiry.  The Louis Dreyfus entities also contend that even if the shipping pier was a point source, they did not need to collect samples from it because the 2010 and 2015 general permits did not require sampling of substantially identical monitoring points.  *See* Dkt. # 54 at 18.  They contend that the shipping pier is substantially identical to the access pier.  *Id.*

The 2010 and 2015 general permits require sampling of "each distinct point of *discharge* off-site except as otherwise exempt from monitoring as a 'substantially identical outfall.'"  *See* Dkt. # 52 (Zemel Decl.) Ex. 3 at 23, Ex. 4 at 26 ("The Permittee shall sample each distinct point of *discharge* off-site except as otherwise exempt from monitoring as a '*substantially identical discharge point*.'").  Permittees are required to prepare SWPPPs that identify discharge points which they will not sample because they are substantially identical to another discharge point being sampled.  *See id.* Ex. 3 at 21, Ex. 4 at 24.

ORDER – 16

It is undisputed that the SWPPPs in effect for the facility did not identify the shipping pier as substantially identical to the access pier.  *See id.* Ex. 5 at 25, Ex. 6 at 25, Ex. 14 at 25, Ex. 15 at 25.  Although permittees are only required to monitor one of two substantially identical discharge points, that exemption is subject to Condition S3.B.5.b. *See id.* Ex. 3 at 23, Ex. 4 at 26.  Condition S3.B.5.b mandates that SWPPPs include documentation of why a discharge point is not sampled as a substantially identical point. *Id.* Ex. 3 at 21, Ex. 4 at 24.  In other words, the Louis Dreyfus cannot rely on this exemption from the sampling requirement because they did not include this justification in their SWPPPs.  *See Puget Soundkeeper Alliance v. Rainier Petroleum Corp.*, 138 F. Supp. 3d 1170, 1178 (W.D. Wash. 2015) (finding that summary judgment was appropriate where defendant conceded that sampling plan was not justified under SWPPP, even if its sampling plan could have been justified under a properly drafted SWPPP).  In short, the Louis Dreyfus entities are not entitled to rely on the "substantially identical" exemption to justify its past failures to sample the shipping pier.  It may well be the case that the shipping pier is substantially identical to the access pier with respect to their discharges (*see* Dkt. # 59 (Reese Decl.) ¶¶ 15, 20), but Louis Dreyfus must include that justification in their SWPPP.

Finally, Louis Dreyfus argues that creating a monitoring point on the shipping pier would create unsafe conditions, where sampling is not required.  *See* Dkt. # 54 at 19.  All versions of the general permit exempt permittees from sampling where sampling must be done during unsafe conditions.  *See* Dkt. # 52 (Zemel Decl.) Ex. 2 at 27, Ex. 3 at 23, Ex. 4 at 25.  There is evidence that creating a monitoring point on the shipping pier would create unsafe conditions (*see* Dkt. # 58 (Alongi Decl.) ¶ 7), but that does not alleviate Louis Dreyfus' liability for failing to sample that point when no unsafe conditions existed.

In short, the Court finds that summary judgment is not appropriate for Louis Dreyfus' alleged failure to sample the shipping pier.  Louis Dreyfus has presented some

evidence that the shipping pier is not a "point source" as contemplated by the CWA. Nevertheless, the Court rejects Louis Dreyfus' contentions that they were otherwise exempt from sampling the shipping pier's discharges as "substantially identical" to the access pier or because establishing a monitoring point would create an unsafe condition. Louis Dreyfus failed to justify their failure to sample the shipping pier in the SWPPP, negating any "substantially identical" justification.  Moreover, there is no dispute that no unsafe conditions actually existed during this period.

### iii. *Failure to Submit Discharge Monitoring Reports*

Next, the PSA argues that Louis Dreyfus is liable for failing to submit discharge monitoring reports ("DMRs") for three of its four required sampling points for a substantial portion of the statutory period.  *See* Dkt. # 41 at 20.  The general permits require permittees to submit DMRs for each required sample point in each quarter, even when samples are not taken.  *See* Dkt. # 52 (Zemel Decl.) Ex. 2 at 39, Ex. 3 at 38, Ex. 4 at 45.  It is not seriously disputed that no DMRs were submitted for the access pier or catch basin 1 ("CB # 1") from the second quarter of 2009 to the second quarter of 2014.[16] *See id.* Ex. 10; Dkt. # 59 (Reese Decl.) Ex. 5.  Each failure to submit a DMR is a separate violation.  *See Puget Soundkeeper Alliance v. Rainier Petroleum Corp.*, 138 F. Supp. 3d at 1182.

The Louis Dreyfus entities argue that this claim fails because the PSA did not provide adequate notice.  *See* Dkt. # 54 at 22.

Before a private person may commence an action under the citizen-suit provision of the CWA, "the citizen must give a 60-day notice of intent to sue."  *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 799-800 (9th Cir. 2008) (citing 33 U.S.C. § 1365(b)(1)(A)).  The Ninth Circuit has "strictly construed" the CWA's notice requirements.  *See Nat. Res. Defense Council v. Sw. Marine, Inc.*, 236 F.3d 985, 998 (9th

---

[16] The PSA also requests summary judgment as to Louis Dreyfus' failure to submit DMRs for the shipping pier.  However, because a genuine issue exists as to whether the shipping pier is a point source for which a monitoring point is necessary, summary judgment is inappropriate.

ORDER – 18

Cir. 2000).  The "Ninth Circuit, even at its most lenient, requires notice to inform the targeted party 'precisely what it allegedly did wrong, and when.'"[17]  *San Francisco Herring Assoc. v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 857 (N.D. Cal. 2015) (quoting *Marina Point*, 566 F.3d at 801).  In other words, notice is ordinarily "sufficient if it is reasonably specific and gives the accused company the opportunity to correct the problem."  *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 916 (9th Cir. 2004) (quoting *San Francisco Baykeeper*, 309 F.3d at 158) (internal quotation marks omitted).

The notice letter cites the relevant permit conditions and alleges six failures to timely submit DMRs.  *See* SAC at 19 (citing condition S5.A of the 2002 general permit and S9.A of the 2010 general permit "Louis Dreyfus has violated these conditions by failing to submit a DMR within the time prescribed for the first quarter of 2009, second quarter of 2009, third quarter of 2009, fourth quarter of 2009, fourth quarter of 2013, and first quarter of 2014").

First, to the extent that the Louis Dreyfus entities argue that the PSA provided adequate notice of only these six violations, that argument is squarely foreclosed because these other DMR violations are "closely and of the same type as the violations specified in the notice of intent to sue."  *Henry Bosma Dairy*, 305 F.3d at 951 (quoting *Comfort Lake Ass'n v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir. 1998)); *see also Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917 (9th Cir. 2004) (quoting *id.*) ("plaintiffs are not required to 'list every specific aspect or detail of every alleged violation.'").

The Louis Dreyfus entities also appear to contend that the violation alleged in the notice letter – the failure to *timely* submit DMRs – is distinct from the violation the PSA now pursues – the failure to submit DMRs at all.  *See* Dkt. # 54 at 23.  The Court sees

---

[17] The implementing regulations provide further guidance.  *See* 40 C.F.R. § 135.3(a).

ORDER – 19

little difference between the two violations. In either case, the Louis Dreyfus entities violated the general permit by failing to submit a DMR.

To the extent that the Louis Dreyfus entities argue that the notice letter failed to provide enough detail as to the location (i.e., specifying the monitoring points) or dates of the violations, the Court finds otherwise. The notice letter identified the relevant location – the facility. *See* SAC at 14; *see also Pac. Lumber Co.*, 713 F.3d at 519 (finding notice letter sufficient where it did not provide exact locations of preservative-treated utility poles, but simply identified representative poles and referenced defendant's superior knowledge of other pole locations). And courts have held that plaintiffs may pursue violations in the time period (or beyond) specified in the notice letter. *See Henry Bosma Dairy*, 305 F.3d at 952; *W. Bay Sanitary Dist.*, 791 F. Supp. 2d at 753.

As a result, the Court finds that summary judgment is appropriate for Louis Dreyfus' violations of the DMR submission requirements between the second quarter of 2009 to the second quarter of 2014 for CB # 1 and the access pier. The Court therefore finds that the relevant Louis Dreyfus entity is liable for 42 total violations of the general permits.

     d.  <u>Whether Summary Judgment is Appropriate for Vacuum Sweeper Failures</u>

The PSA next seeks a finding that the relevant Louis Dreyfus entity violated the 2010 and 2015 general permits by failing to use a vacuum sweeper on the shipping and access piers each quarter between January 1, 2010 and March 3, 2015. *See* Dkt. # 41 at 21. The 2010 and 2015 general permits mandate permittees to include quarterly vacuuming of paved surface with a vacuum sweeper as a best management practice ("BMP"). *See* Dkt. # 52 (Zemel Decl.) Ex. 3 at 17, Ex. 4 at 20. It appears relatively undisputed that the Louis Dreyfus entities did not use a vacuum sweeper on the paved shipping and access piers between January 1, 2010 and March 3, 2015. *See id.* Ex. 19 at 3 (indicating that vacuum sweeping began on March 3, 2015). Summary judgment is thus appropriate for these 20 quarters.

ORDER – 20

e.  <u>Whether Summary Judgment is Appropriate for Bird Feeding BMPs</u>

Next, the PSA seeks summary judgment against the Louis Dreyfus entities for failing to adopt BMPs for preventing birds from feeding on the shipping pier.  *See* Dkt. # 41 at 21.  The 2010 and 2015 general permits require permittees to incorporate and implement BMPs that "[u]se all known, available and reasonable methods to prevent rodents, birds, and other animals from feeding/nesting/roosting at the facility."  *See* Dkt. # 52 (Zemel Decl.) Ex. 3 at 33, Ex. 4 at 36.  This requirement applies for discharges to any body of water listed in § 303(d) of the CWA.  *See id.* Ex. 3 at 31, Ex. 4 at 34.

The PSA requests summary judgment for violations occurring on eight dates: September 7 and 9, 2015, December 14 and 24, 2015, January 30, 2016, and February 2, 4, and 5, 2016.  *See* Dkt. # 41 at 21-22.  The PSA contends that every time Louis Dreyfus leaves large quantities of grain on the pier, it violates this permit condition.  *See id.* at 21.

The Louis Dreyfus entities first argue that the PSA failed to provide adequate notice of this claim.  *See* Dkt. # 54 at 24.  They argue that although the PSA generally alleged that Louis Dreyfus failed "to apply all known and reasonable methods of prevention, control and treatment ('AKART') to all discharges, including preparation and implementation of an adequate SWPPP and best management practices ('BMPs')" (*see* SAC at 15) the PSA did not specifically identify Condition S6 as a condition being sued upon, despite specifically identifying other conditions (*see* Dkt. # 54 at 24). Additionally, the Louis Dreyfus entities argue that the notice letter did not provide any information regarding the regulatory status of Elliott Bay – namely that it was an impaired water body.

In this instance, the Court agrees with the Louis Dreyfus entities.  As they rightly note, the notice letter does not identify the relevant condition, activity, or date of the violation.  *See* 40 C.F.R. § 135.3(a).  Neither the notice letter nor the supplemental letter mentions birds or the facility's apparent practice of leaving grain on the shipping pier for long periods of time.  *See* SAC at 14-26.  None of these gives any notice of the relevant condition or activity alleged to have been violated.  Defendants are "not required to play

ORDER – 21

1
2
3
4
5
6

a guessing game" as to "precisely what it allegedly did wrong, and when." *See Marina Point*, 566 F.3d at 801.  It may well be the case that the Louis Dreyfus entities have "superior access to information about its own activities," but they were never put on notice of what activity was allegedly violating the CWA here – there are numerous BMPs which could have been at issue.  *See Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015).

7
8
9

Because the PSA did not provide adequate notice of the bird-related BMP violations, the Court does not have jurisdiction over those claims.  Summary judgment is inappropriate.

10

      f.  <u>Whether Summary Judgment is Appropriate for Failures to Maintain SWPPP</u>

11
12
13
14
15

Finally, the PSA seeks summary judgment against the Louis Dreyfus entities for deficiencies in the SWPPPs in effect between January 1, 2010 and June 5, 2014.  *See* Dkt. # 41 at 22-24.  They identify several problems in the SWPPP:[18] (1) the failure to depict the shipping pier, (2) a deficient facility assessment, and (3) a noncompliant sampling plan.  *Id.*

16
17
18
19
20
21
22

The Court has found that a genuine issue exists as to whether the shipping pier is a point source.  Louis Dreyfus also presents some evidence suggesting that the some of the activities – namely the areas where the tanker car and storage tank are located in and where locomotive maintenance occurs – did not necessarily need to be listed in the SWPPP.  *See* Dkt. # 54 at 21 (citing Dkt. # 55 (Tan Decl.) ¶ 2, Ex. B [Horner Depo. Tr.] at 23:10-15).  These same reasons appear to inform the deficiencies asserted in the SWPPP's sampling plan.

23
24
25
26

  There is no dispute, however, that the SWPPP was deficient in at least a few respects.  First, the SWPPP does not provide the business hours for the facility.  *See* Dkt. # 52 (Zemel Decl.) Ex. 5.  Second, the SWPPP does not identify the outdoor grain conveyance system and loading towers as sources of zinc contamination.  *See id.*  These

27
28

---

[18] Apparently, the PSA only challenges on summary judgment the SWPPP in effect at the time the complaint was filed.  *See* Dkt. # 41 at 22.

ORDER – 22

appear to violate the 2010 and 2015 general permit's SWPPP requirements.  *See* Dkt. #
52 (Zemel Decl.) Ex. 3 at 16 (facility assessment must include "inventory of *facility*
activities and equipment that contribute to or have the potential to contribute any
*pollutants* to *stormwater*" and include "*Regular business hours* and seasonal variations in
business hours or industrial activities"), Ex. 4 at 18-19 (same).

It appears, then, that the PSA is entitled to summary judgment for these two
deficiencies in the SWPPP for each day from January 1, 2010 to June 5, 2014.  There
remains a genuine dispute regarding the liable parties.

## V.   CONCLUSION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part**
the PSA's Motion for Partial Summary Judgment.  Dkt. # 41.


DATED this 24th day of June, 2016.



The Honorable Richard A. Jones
United States District Judge

ORDER – 23